**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMES E. SHELTON,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>**PURE ENERGY USA, PA, LLC d/b/a PURE ENERGY USA, ALONZO AMAR, ARASH AKHAVAN A/K/A "ALAN," AND DOE DEFENDANT PSG ZONE D/B/A PUREPSGPA AND/OR ENERGY SOURCE SERVICES**<br><br>*Defendants.* | Case No. 2:25-cv-03590-MMB<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiff James E. Shelton ("Plaintiff") brings this First Amended Class Action Complaint and Demand for Jury Trial against Defendants Pure Energy USA, PA, LLC d/b/a Pure Energy USA ("Pure Energy"), Alonzo Amar, Arash Akhavan a/k/a "Alan," and Doe Defendant PSG Zone d/b/a PurePSGPA and/or Energy Source Services (collectively, "Defendants"), and alleges as follows:

1. Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from

telemarketers' id. § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' id. § 2(9).

2. "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.') . . . Private suits can seek either monetary or injunctive relief. *Id.* . . . This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.,* 925 F.3d 643, 649-50 (4th Cir. 2019).

3. Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA, alleging that Defendants violated the TCPA by making telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent, and by making telemarketing calls without the accurate provision of Caller ID Name (CNAM) information.

**PARTIES**

4. Plaintiff is an individual who resides in Montgomery County, Pennsylvania, which lies within this District.

5. Defendant Pure Energy USA, PA, LLC d/b/a Pure Energy USA ("Pure Energy") is registered to do business in Pennsylvania, with its registered agent office address in Dauphin County. Pure Energy is an alternative electric supply provider. The telemarketing calls at issue were made to sell Pure Energy's electric supply services, and Plaintiff's resulting enrollment and customer contract were with, and for the benefit of, Pure Energy.

6. Defendant Alonzo Amar ("Amar") is an individual who, at all times relevant, subscribed to, owned, operated, controlled, and/or was responsible for the toll-free telephone number (833) 423-0533, the number that placed the subject telemarketing calls to Plaintiff and that Plaintiff called back, and for the call center operation using that number to market Pure Energy's electric supply services under the fictitious name "Energy Source Services."

7. Defendant Arash Akhavan, also known as "Alan" ("Akhavan" or "Alan"), is an individual who, upon information and belief, owns and/or controls the Google Voice telephone number from which "Alan" called Plaintiff's counsel after this suit was filed, and who was involved in the telemarketing operation that placed the subject calls on behalf of Pure Energy.

8. Doe Defendant PSG Zone d/b/a PurePSGPA and/or Energy Source Services ("Doe Defendant" or "PSG Zone") is a currently unknown person or entity operating under the names "PSG Zone," "PurePSGPA," and/or the email address alan@psg.zone, that participated in the Pure Energy telemarketing, signup, and verification process described herein. Plaintiff will

seek leave to amend to substitute the true name of the Doe Defendant once its identity is ascertained through discovery.

## JURISDICTION AND VENUE

9. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 et seq.

10. The Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff resides within this District and the calls at issue were made into this District by Defendants and those acting on their behalf.

## BACKGROUND

### A. The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.

11. The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. See 47 U.S.C. § 227(c)(5).

12. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2).

13. A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

14. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the Registry and provide a private right of

action against any entity that makes those calls, or "on whose behalf" such calls are made or promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**B. The TCPA Also Requires Telemarketers to Transmit Caller Identification Information Including the Telemarketer's Name.**

15. The TCPA requires any "person or entity that engages in telemarketing" to "transmit caller identification information." 47 C.F.R. § 64.1601(e).

16. The relevant regulation defines "caller identification information" as "either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e)(1).

17. A violation of this subsection of the TCPA is enforceable under the private right of action provided for under 47 U.S.C. § 227(c)(5). *Dobronski v. Selectquote Ins. Servs.,* No. 2:23-CV-12597, 2025 WL 900439, at *3 (E.D. Mich. Mar. 25, 2025).

**<u>FACTUAL ALLEGATIONS</u>**

18. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

19. At no point did Plaintiff consent to receiving telemarketing calls from Defendants prior to receiving the calls at issue.

20. Plaintiff's telephone number, (215) XXX-XXXX, is a residential, non-commercial telephone number.

21. Plaintiff uses the number for personal, residential, and household reasons.

22. Plaintiff does not use the number for business reasons or business use.

23. The number is a residential telephone line because it is assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

24. Moreover, the telephone line is assigned to a cellular service which is presumptively residential and was eligible for registration on the National Do Not Call Registry at the time it was registered.

25. Plaintiff's telephone number has been listed on the National Do Not Call Registry for over a year prior to the calls at issue.

26. Plaintiff has never been a customer of Defendants.

27. Despite that fact, Plaintiff received at least three telemarketing calls promoting Pure Energy's services in June 2025.

28. The first and second calls were on June 23, 2025 at 4:02 PM from caller ID (833) 423-0533. Plaintiff missed both calls.

29. The third call was on June 24, 2025 at 12:03 PM from caller ID (833) 423-0533. Plaintiff missed the call.

30. Later in the day on June 24, Plaintiff called back (833) 423-0533 to see who had called him three times.

31. Plaintiff spoke with "Tessa" from the illegally and fictitiously named "Energy Source Services," who stated their company was calling and looking to assist all Pennsylvania electric customers to ensure they were getting their benefits applied onto the correct account by getting a competitive electric supplier.

32. After speaking to "Tessa," the call suddenly dropped after approximately one minute.

33. Plaintiff then immediately called the number back and spoke with "Travis," who again said he was with the illegally and fictitiously named "Energy Source Services," which assists customers with their utilities and the "customer choice program on their bill."

34. Travis identified Plaintiff as "Philip Fleming" from Philadelphia, as that was the incorrect information they had for the individual they were looking for on the previous calls Plaintiff received.

35. Plaintiff told Travis he had another property in King of Prussia, Pennsylvania, and provided him with his electric account number.

36. Travis told Plaintiff he would be eligible for a reimbursement of up to $200 from Pure Energy USA every six months.

37. Plaintiff was then put through a third-party verification process required by the Commonwealth of Pennsylvania.

38. After completing the sign up, Plaintiff received a proposed contract from Pure Energy in the mail, which Plaintiff timely rescinded.

39. The contract identified the supplier by its legal business name: Pure Energy USA PA, LLC ("Pure Energy USA").

40. The calls all came from the following numbers. Counsel for the Plaintiff has access to "dip" the Caller ID database of the calling carrier to ascertain the CNAM information to ascertain (1) whether caller name delivery (CNAM) is available with the Defendant's calling

carrier, and (2) whether such CNAM information contained the name of the telemarketer. The results of those dips are as follows:

| Number | Date | CNAM Avail? | CNAM Result | Carrier |
|---|---|---|---|---|
| (833) 423-0533 | 23/06/2025 | Y | TOLL FREE CALL | Onvoy/Inteliquent |
| (833) 423-0533 | 23/06/2025 | Y | TOLL FREE CALL | Onvoy/Inteliquent |
| (833) 423-0533 | 24/06/2025 | Y | TOLL FREE CALL | Onvoy/Inteliquent |

41. As the aforementioned chart shows, the CNAM transmitted by the Defendant's ultimate telephone carrier, Onvoy/Inteliquent, provided CNAM functionality, but provided inaccurate CNAM functionality, transmitting a placeholder indicating that the call was a toll free call, instead of the caller's name.

42. After filing the original Complaint and this Court's order granting Plaintiff leave to amend, Plaintiff undertook an investigation into the source of the calls and the calling operation that generated them, and learned the additional facts set forth below.

43. As explained above, the subject calls were placed from the telephone number 833-423-0533. When Plaintiff called back that number, he reached representatives using the fictitious name "Energy Source Services." "Tessa" and "Travis" marketed Pure Energy's alternative electric supply services and promotional offers. Plaintiff was then transferred into a state-mandated third party verification ("TPV") process, which was administered through the TPV vendor VerbatimTPV.

44. Plaintiff received a customer contract and confirmation from Pure Energy USA, PA, LLC.

45. A subpoena to the ultimate telephone carrier of record for the 833-423-0533 number, Alliance Phones, Inc., revealed that the subscriber of record for that number was Defendant Alonzo Amar.

46. As a result, and based on the foregoing information, Plaintiff alleges that Defendant Alonzo Amar subscribed to, controlled, and/or operated the telephone number 833-423-0533, which was used to place the subject telemarketing calls and to receive Plaintiff's callback. Amar and/or his agents and vendors, including possibly Akhavan and PSG Zone, used that number to market Pure Energy's electric supply services under the fictitious name "Energy Source Services."

47. After suit was filed, an individual identifying himself as "Alan" called Plaintiff's counsel from a Google Voice telephone number. A subpoena to Google for the subscriber of record for that number revealed that it was registered by an individual in the name of Defendant Arash A[khavan], including because it was linked to Defendant Akhavan's personal cell phone number.

48. "Alan" (most likely an alias for Akhavan) stated he was calling on behalf of Pure Energy, referenced the presuit demand and this lawsuit, and admitted that "*we*" had called Plaintiff multiple times in connection with the sale of energy services. This post-suit admission ties Akhavan/"Alan" to the same Pure Energy telemarketing campaign that generated the subject calls to Plaintiff.

49. Defendant Arash Akhavan has previously been identified in federal litigation as an agent or representative involved in energy service telemarketing operations, making it plausible that Akhavan/"Alan" was involved in the telemarketing operation at issue here.

50. Plaintiff also served a subpoena on VerbatimTPV for the user and vendor records associated with the Plaintiff's sign up with Pure Energy described above.

51. The VerbatimTPV records with respect to that call reflects "CSD 02." As part of its production, VerbatimTPV produced data tables of logins associated with Pure Energy's account with Verbatim TPV. Those records identify a user and login associated with the email address "alan@psg.zone" and with the alias "PurePSGPA," and a "CSD 02" code as being tied to that PSG/PurePSGPA account.

52. It does not appear that the company "PSG Zone," "Pure PSG," "PSGPA," or similar companies are registered as legitimate companies in any state or jurisdiction. Upon information and belief, the unknown person or entity operating under PSG Zone, PurePSGPA, and/or the email address alan@psg.zone participated in the Pure Energy signup and verification process.

53. However, Plaintiff is without sufficient information to ascertain who "PSG Zone" is at this time, including whether or not they *are* an existing Defendant or another Defendant entirely. This is because Plaintiff requested that Defendant identify this entity, including through its agent code, from VerbatimTPV, and VerbatimTPV responded that the relevant information is not in its control, but rather Pure Energy's control, because Pure Energy solely controls who has access to its account with VerbatimTPV.

54. Defendants Amar, Akhavan/"Alan", and the Doe Defendant (PSG Zone) are directly liable under the TCPA because they initiated, or caused the initiation of, the subject calls by taking the steps necessary to place the calls and to route Plaintiff into Pure Energy's sales and TPV process.

55. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act,* 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

56. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears responsibility for any violations.

57. The FCC has instructed that sellers such as Pure Energy may not avoid liability by hiding behind third-party agents and outsourcing their telemarketing operations to third parties such as Amar, Akhavan/"Alan", and/or PSG Zone:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."
>
> *In re DISH Network, LLC,* 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

58. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

59. Pure Energy is vicariously liable for the conduct of Amar, Akhavan/"Alan", and the Doe Defendant (PSG Zone) (collectively, the "Energy Source Services Defendants"), and for

the telemarketing calls placed and handled by them, transferred through the TPV process, and routed to generate customers for Pure Energy, including Plaintiff.

60. The agency chain proceeded as follows: the Energy Source Services Defendants generated and handled the calls, including call backs from confused customers after having placed the initial calls. Individuals like Plaintiff were then transferred into Pure Energy's VerbatimTPV account, VerbatimTPV verified the Pure Energy sale, and Pure Energy accepted the enrollment and issued the individual's customer contract and confirmation.

61. Pure Energy's relationship with the Energy Source Services Defendants contains numerous hallmarks of agency.

62. The transaction proceeded as a single, continuous enterprise moving without interruption from lead generation and marketing (with the Energy Source Services Defendants), through verification and compliance (VerbatimTPV), to Pure Energy's acceptance of the enrollment and issuance of the customer contract. Pure Energy's participation in, and adoption of, this seamless process is itself evidence that Pure Energy held out the Energy Source Services Defendants as acting on its behalf, and that they were in fact acting within the scope of authority actually or apparently granted to them by Pure Energy.

63. The callers marketed Pure Energy by name and conveyed Pure Energy's specific pricing and benefit terms, including special offers, demonstrating that they possessed, and were authorized to convey, Pure Energy's proprietary offer terms to prospective customers.

64. Indeed, Pure Energy authorized the Energy Source Services Defendants to sell electric services on its behalf and directly gave them login information to Pure Energy's account with VerbatimTPV, which is a hallmark of agency.

65. Pure Energy supplied (though its own account) and controlled (by setting up the necessary login credentials for the Energy Source Services Defendants) the mandatory TPV and verification function through which every sale, including Plaintiff's, had to pass. Without Pure Energy's TPV process and acceptance, by operation of Pennsylvania law, the sale could not be completed, giving Pure Energy control over the sequence and compliance framework of the enrollment for each customer, up to and including Plaintiff.

66. The "CSD 02" designation reflected in Plaintiff's completed TPV record ties Plaintiff's sale to the Energy Source Services Defendants that were authorized to submit enrollments into Pure Energy's TPV system, further evidencing that Energy Source Services Defendants operated within, and under the control of, a scheme administered for the benefit of Pure Energy.

67. After suit was filed, "Alan" directly admitted, in a call to Plaintiff's counsel, that he was calling "on behalf of Pure Energy" and that "we" had called Plaintiff multiple times in connection with the sale of energy services. This is a direct admission, made by an agent of the calling operation, that the operation was acting on Pure Energy's behalf.

68. Nor was Plaintiff ever given any indication that he was dealing with multiple, independent entities. To the contrary, the callers held themselves out as marketing and enrolling Plaintiff for Pure Energy's services, and the process culminated seamlessly in a Pure Energy customer contract.

69. Pure Energy accepted the fruits of the illegal calls by completing Plaintiff's enrollment, sending the customer contract and confirmation, maintaining the TPV process through which the sale was verified, and failing to repudiate the sale or the calling operation after learning how the lead was generated.

70. Pure Energy's failure to supervise, audit, or terminate the Energy Source Services Defendants despite actual or constructive knowledge of the manner in which calls such as the one at issue were being generated and conducted, including calls placed to numbers on the National Do Not Call Registry, in violation of the TCPA, constitutes ratification of that conduct, rendering Pure Energy directly and/or vicariously liable under the doctrines of actual agency, apparent agency, and ratification.

71. By specifying the leads and enrollment criteria it would accept through its TPV process, Pure Energy directed the content, method, and criteria of the communications Energy Source Services Defendants used to generate and verify enrollments meeting Pure Energy's specified criteria.

72. A reasonable seller like Pure Energy, whose agents and vendors are making telemarketing calls and transferring enrollments on its behalf, would investigate the methods by which those calls are generated and indeed had the means of doing so, by auditing the TPV records and recordings themselves.

73. Pure Energy did not.

74. As such, Pure Energy knowingly ratified the Energy Source Services Defendants' conduct, because, with knowledge that it was relying on those parties to generate and verify enrollments, it accepted the enrollment, issued the customer contract, and attempted to monetize the transferred sale, including as to Plaintiff.

75. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network,* 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances

pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

76. Here, the Energy Source Services Defendants are directly liable under the TCPA as the initiators of the subject calls. Pure Energy is vicariously liable for authorizing the marketing operation conducted by the Energy Source Services Defendants, sponsoring, directing the campaign through, and giving the Energy Source Services Defendants access to its TPV and enrollment criteria, pricing, and special offers to use on the calls, and accepting and monetizing the enrollment with thee ability to have full awareness of how it was generated.

77. The calls were unwanted.

78. Plaintiff's privacy has been repeatedly violated by the above-described telemarketing calls.

79. Plaintiff never provided his consent or requested the calls.

80. Plaintiff and the Classes have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## **CLASS ACTION ALLEGATIONS**

81. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

82. Plaintiff brings this action on behalf of himself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23.

> **National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendant encouraging the purchase of Defendant's goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.
>
> **Telemarketing Caller ID Class:** All persons within the United States to whom: (1) Defendant (or a third-party acting on behalf of Defendant) sent (2) two or more telemarketing calls in a 12-month period, (3) which either (a) did not transmit caller identification information that included either CPN or ANI and the Defendant's or telemarketer's name, (b) did not transmit a valid CPN or ANI at all, and/or (c) transmitted a CPN or ANI that would not have allowed an individual to make a do not call request during regular business hours, (4) within the four years prior to the filing of the Complaint.

83. **Numerosity**: The exact number of Class members is unknown but based on the *en masse* nature of telemarketing is believed to be at least hundreds of persons at this time, and individual joinder in this case is impracticable. Class members can be easily identified through Defendants' records, or those of their agents.

84. **Typicality**: Plaintiff's claims are typical of the claims of other Class members in that Plaintiff, and Class members, sustained damages arising out of Defendants' telemarketing calls and Class members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

85. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Classes, and Defendants have no defenses unique to Plaintiff.

86. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

a. Whether Defendants obtained "prior express invitation or permission" under the TCPA, before the calls at issue;

b. Whether Defendants transmitted CPN or ANI and its name in the caller ID information, when provided as an option by their telephone carrier, to Plaintiff and members of the Telemarketing Caller ID Class;

c. Whether Defendants violated the TCPA; and

d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other Class members are entitled to treble damages under 47 U.S.C. § 227(c)(5).

87. **Superiority**: Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There are hundreds of Class members in each class, such that joinder of all members is impracticable.

88. In addition to satisfying the prerequisites of FED. R. CIV. P. 23(a), Plaintiff satisfies the requirements for maintaining a class action under FED. R. CIV. P. 23(b) because:

a. The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c. Defendants have acted or refused to act on grounds that apply generally to the proposed Classes, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole; and

d. Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227**
**(On Behalf of Plaintiff and the National DNC Class)**

89. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

90. It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. 64.1200(c)(2).

91. Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, as the case may be, and as revealed through discovery, violated the TCPA by causing multiple telephone solicitation calls to be initiated to Plaintiff and members of the National

DNC Class in a 12-month period, despite the person's registration of his or her telephone numbers on the National Do Not Call Registry.

92. These violations were willful or knowing.

93. As a result of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's, as the case may be, and as revealed through discovery, violations of the TCPA's national do-not-call rule, Plaintiff and members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

94. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

**<u>COUNT II</u>**
**Violations of the TCPA, 47 U.S.C. § 227**
**(On Behalf of Plaintiff and the Telemarketing Caller ID Class)**

95. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

96. It is a violation of the TCPA to make a telemarketing call without the transmission of caller identification information including either a CPN or ANI and, when available by the telemarketer's carrier, the name of the telemarketer. 47 C.F.R. § 64.1601(e)(1).

97. Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, as the case may be, and as revealed through discovery, violated the TCPA by causing multiple telemarketing calls to be initiated to Plaintiff and members of the Telemarketing Caller ID Class in a 12-month period, without transmitting the name of the telemarketer, despite such option for transmission of accurate CNAM information being available by its carrier.

98. These violations were willful or knowing.

99. As a result of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's, as the case may be, and as revealed through discovery, violations of the TCPA's telemarketing Caller ID transmission requirement, Plaintiff and members of the Telemarketing Caller ID are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

100. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully request that the Court enter judgment against Defendants for:

A. Certification of the Classes as alleged herein;

B. Appointment of Plaintiff as representative of the Classes;

C. Appointment of the undersigned as counsel for the Classes;

D. Damages to Plaintiff and members of the Classes pursuant to 47 U.S.C. § 227(c)(5);

E. Injunctive relief for Plaintiff and members of the Classes, pursuant to 47 U.S.C. § 227(c)(5), preventing the Defendants from making calls to numbers listed on the National Do Not Call Registry, to those who have asked them to stop, outside the permitted hours, or while failing to transmit the caller ID information required by law;

F. Attorneys' fees and costs, as permitted by law; and

G. Such other or further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 2nd day of July, 2026.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
PA Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2026, a copy of the foregoing was served via CM/ECF, which will electronically serve all counsel of record who have appeared.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
PA Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com