**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JAMES E. SHELTON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PURE ENERGY USA, PA, LLC d/b/a PURE ENERGY USA, ALONZO AMAR, ARASH AKHAVAN A/K/A "ALAN," AND DOE DEFENDANT PSG ZONE D/B/A PUREPSGPA AND/OR ENERGY SOURCE SERVICES,

Defendants.

Case No. 2:25-cv-03590-MMB

CLASS ACTION

JURY TRIAL DEMANDED

**PLAINTIFF'S OPPOSITION TO DEFENDANT PURE ENERGY USA, PA, LLC'S MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

## Introduction

Until discovery in this case, no one outside the calling operation knew who placed the telemarketing calls that Plaintiff James Shelton received on June 23 and 24, 2025. The calls came from a toll-free number, (833) 423-0533. When Plaintiff called that number back to learn who had called him three times, he reached representatives of a company calling itself "Energy Source Services," who told him he would be eligible for a reimbursement "from Pure Energy USA," put him through a third party verification process, and enrolled him as a customer of Defendant Pure Energy USA, PA, LLC ("Pure Energy"). (ECF No. 23, First Am. Compl. ("FAC") ¶¶ 27-39.)

Pure Energy answered the original Complaint with a declaration insisting that it places no outbound calls and that its "contractors" only receive inbound ones. The Court dismissed the original Complaint without prejudice, granted leave to amend, and granted Plaintiff leave to commence discovery regarding the identity of the caller and the source of the calls. (ECF No. 24 at 1; *see* ECF No. 35-1, "MTD," at 1.) Plaintiff did what the Court allowed. Third-party subpoenas to the chain of telephone carriers, to Google, and to Pure Energy's third-party verification vendor, VerbatimTPV, identified the subscriber of the toll-free number (Defendant Alonzo Amar), the subscriber of the telephone number from which "Alan" called Plaintiff's counsel after suit was filed (Defendant Arash Akhavan), and, most importantly, a user login inside Pure Energy's own VerbatimTPV account tied to the email address "alan@psg.zone," the alias "PurePSGPA," and the "CSD 02" code on Plaintiff's own verification record. (FAC ¶¶ 45-51, 66.)

The First Amended Complaint pleads what that discovery revealed. Pure Energy gave the Energy Source Services operation login credentials *to its account*, the operation's representatives marketed Pure Energy by name and conveyed Pure Energy's specific pricing and offer terms, every sale had to pass through the verification process that Pure Energy supplied and controlled, "Alan"

told Plaintiff's counsel he was calling "on behalf of Pure Energy," and Pure Energy accepted the enrollment, issued the contract, and never repudiated any of it. (FAC ¶¶ 59-74.)

Pure Energy's response is a new declaration from a different officer making the same denials, together with a repackaged motion. The new declaration says nothing about the login in Pure Energy's own VerbatimTPV account through which it accepted sign ups through the Pennsylvania state mandated TPV process. That omission matters, because Pure Energy is the only appearing party, and the only party that knows whom it contracted with, whom it gave access to its account, and what its contracts say. The FAC alleges that VerbatimTPV told Plaintiff the identity of the user is in Pure Energy's control, not VerbatimTPV's. (FAC ¶ 53.) Pure Energy's motion then turns the resulting gap against Plaintiff. Two of the three newly named defendants are no longer in the case because Plaintiff dismissed them without prejudice to keep the case moving, and the third has been defaulted. (ECF Nos. 30, 31.) Pure Energy now argues that, because those parties are not before the Court, the calls are not "fairly traceable" to it and no agent has been identified. A defendant that controls the evidence of its own agency relationships cannot defeat a plausible claim by pointing to the absence of the witnesses who refuse to appear.

The motion should be denied. Pure Energy's Rule 12(b)(1) "factual attack" is its merits defense restyled as a jurisdictional one, and the Court has already warned that the exchange of affidavits converts such a dispute into a summary judgment proceeding. (ECF No. 16.) Its Rule 12(b)(6) arguments are the standard arguments TCPA defendants make against every complaint pleading vicarious liability, and they fail for the reasons Plaintiff gave in response to the first motion and for the additional reasons set out below. At a minimum, any dismissal should be without prejudice and with leave to amend.

## Background

### A. The statutory and regulatory framework.

Section 227(c) of the Telephone Consumer Protection Act ("TCPA") authorizes a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The implementing regulation provides that "[n]o person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry . . . ." 47 C.F.R. § 64.1200(c)(2). A "telephone solicitation" is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15).

The TCPA also reaches those on whose behalf calls are made. "The TCPA allows for vicarious liability," *Dobronski v. Tobias & Assocs., Inc.*, 769 F. Supp. 3d 681, 698 (E.D. Mich. 2025), and the FCC has "repeatedly acknowledged that vicarious liability is viable under the TCPA." *Klassen v. Solid Quote LLC*, 702 F. Supp. 3d 1052, 1058 (D. Colo. 2023). A seller may be held liable under "a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 995-96 (N.D. Ill. 2016) (quoting *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013)); *see also Hartley-Culp v. Green Tree Servicing, LLC*, 52 F. Supp. 3d 700, 703 (M.D. Pa. 2014) (holding that "the TCPA can impose liability directly or vicariously upon any person or entity on whose behalf a third party places a call in violation of § 227(b)(1)(A)").

Finally, any "person or entity that engages in telemarketing" must "transmit caller identification information," which "must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e), (e)(1).

**B. Plaintiff's allegations.**

Plaintiff uses his cellular telephone number for personal, residential, and household purposes, not for business, and the number has been listed on the National Do Not Call Registry for over a year before the calls at issue. (FAC ¶¶ 20-25.) He has never been a customer of Pure Energy and never consented to the calls. (FAC ¶¶ 19, 26, 79.)

On June 23, 2025, at 4:02 PM, Plaintiff received two calls from (833) 423-0533, and on June 24, 2025, at 12:03 PM, he received a third. He missed all three. (FAC ¶¶ 27-29.) Later on June 24, he called the number back to see who had called him. (FAC ¶ 30.) "Tessa," who said she was with "Energy Source Services," told him that her company "was calling and looking to assist all Pennsylvania electric customers to ensure they were getting their benefits applied onto the correct account by getting a competitive electric supplier." (FAC ¶ 31.) The call dropped. Plaintiff called back and reached "Travis," who also said he was with Energy Source Services and who identified Plaintiff as "Philip Fleming" from Philadelphia, "as that was the incorrect information they had for the individual they were looking for on the previous calls Plaintiff received." (FAC ¶¶ 32-34.) Plaintiff gave Travis an electric account number for a second property, and Travis told him he would be eligible for a reimbursement of up to $200 from Pure Energy USA every six months. (FAC ¶¶ 35-36.) Plaintiff was then put through a state-mandated third-party verification process, administered through VerbatimTPV, and later received a contract from Pure Energy, which he timely rescinded. (FAC ¶¶ 37-39, 43-44.)

Plaintiff's counsel queried the Caller ID database of the calling carrier for each call. Each query showed that caller name delivery was available, and each returned the placeholder "TOLL FREE CALL," not the name of any telemarketer. (FAC ¶¶ 40-41.)

After the original Complaint was dismissed with leave to amend and to take discovery, Plaintiff investigated the source of the calls. (FAC ¶ 42.) A subpoena to the carrier of record for

the toll-free number, Alliance Phones, Inc., showed that the subscriber of the toll-free number is Defendant Amar. (FAC ¶ 45.) A subpoena to Google showed that the Google Voice number from which "Alan" called Plaintiff's counsel the day after suit was filed is registered to Defendant Akhavan and linked to his personal cell phone number. (FAC ¶ 47.) "Alan" said he was calling "on behalf of Pure Energy," referenced the presuit demand and this lawsuit, and admitted that "we" had called Plaintiff multiple times in connection with the sale of energy services. (FAC ¶¶ 48, 67.) And a subpoena to VerbatimTPV produced the login tables for Pure Energy's account, which identify a user and login Pure Energy set up associated with "alan@psg.zone" and the alias "PurePSGPA," with a "CSD 02" code tied to that account and to Plaintiff's verification record. (FAC ¶¶ 50-51, 66.) VerbatimTPV told Plaintiff that the identity of that user is within Pure Energy's control, because Pure Energy solely controls who has access to its account. (FAC ¶ 53.)

Against that background, the FAC alleges that the Energy Source Services Defendants initiated the calls and that Pure Energy is vicariously liable for them. (FAC ¶¶ 54, 59.) The agency allegations include that Pure Energy authorized the Energy Source Services Defendants to sell electric services on its behalf and directly gave them login information to its account (FAC ¶ 64), that it supplied and controlled the mandatory verification function through which every sale, including Plaintiff's, had to pass (FAC ¶ 65), that the callers marketed Pure Energy by name and conveyed its specific pricing, benefit terms, and special offers (FAC ¶ 63), that it specified the leads and enrollment criteria it would accept (FAC ¶ 71), that "Alan" admitted he was calling on its behalf (FAC ¶ 67), that nothing told Plaintiff he was dealing with independent entities, and the process ended in a Pure Energy contract (FAC ¶¶ 62, 68), and that Pure Energy accepted and monetized the enrollment, never repudiated it, and did not audit the very records that would have shown how the lead was generated (FAC ¶¶ 69-74).

### C. Procedural history.

Plaintiff filed this action on July 14, 2025. (ECF No. 1.) Pure Energy moved to dismiss with a declaration (ECF No. 7), and Plaintiff opposed (ECF No. 12). On October 9, 2025, the Court ordered counsel to meet and confer about the identity of the entity that made the calls, and warned that "[i]f the Parties file affidavits again, the Court must treat this as a summary judgment proceeding under Fed. R. Civ. P. 12(d), which would involve a great deal of expense for both Parties." (ECF No. 16 at 1.) On November 17, 2025, the Court dismissed the Complaint without prejudice, with leave to amend, and granted Plaintiff leave to commence discovery regarding the identity of the caller and the source of the calls. (ECF No. 24 at 1.) Plaintiff served third-party subpoenas on the carriers, Google, and VerbatimTPV, and on July 2, 2026, filed the FAC. (ECF Nos. 23, 24.)

Pure Energy then moved, unopposed, to extend its response deadline until after the three new defendants had been served or waived service, and the Court granted that motion. (ECF No. 27.) Defendant Akhavan was served (ECF No. 28), did not appear, and the Clerk entered default against him on September 17, 2026 (ECF No. 30). On October 6, 2026, Plaintiff voluntarily dismissed Defendant Amar and Doe Defendant PSG Zone without prejudice under Rule 41(a)(1)(A)(i) and asked the Court to reset the briefing schedule so that Pure Energy, the only party that has appeared, would respond. (ECF No. 31.) Pure Energy filed this motion on October 27, 2026, with a new declaration from its Director of Operations, Eileen Routhier. (ECF Nos. 35-1, 35-2 ("Routhier Decl.").)

## Legal Standard

Under Rule 12(b)(6), a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Rules require

this showing "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted). The complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint need not contain "heightened fact pleading of specifics"; it needs "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint or for determining whether the plaintiff has any evidence to back it up. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002).

Those principles apply with particular force to agency. "Agency is 'typically a factual issue, with the plaintiff at the pleading stage only required to allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts.'" *Klassen*, 702 F. Supp. 3d at 1058-59 (quoting *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 WL 4651395, at *2 (N.D. Ill. Sept. 7, 2016)); *accord Dolemba*, 213 F. Supp. 3d at 995-96 (same); *Hossfeld v. Am. Fin. Sec. Life Ins. Co.*, 544 F. Supp. 3d 1323, 1332 (S.D. Fla. 2021).

Pure Energy also invokes Rule 12(b)(1), arguing that its challenge is "factual" and that the Court may weigh its declaration. (MTD at 9-10.) As explained in Part I, that characterization cannot be squared with the Court's own warning that affidavits convert this dispute into a summary judgment proceeding (ECF No. 16 at 1), or with the fact that the "jurisdictional" question Pure Energy raises is the same question as the merits.

## Argument

### I. Pure Energy's Rule 12(b)(1) challenge fails because the "jurisdictional" question it raises *is* the merits question.

Pure Energy first asks the Court to dismiss the entire FAC for lack of Article III standing, on the theory that its declaration "break[s] the factual link" between it and Plaintiff's injury. (MTD at 12-15.) Pure Energy does not argue that receiving three unwanted telemarketing calls is not a concrete injury. It argues that the injury is not "fairly traceable" to Pure Energy because Pure Energy "did not call Plaintiff, did not know of or participate in any such calls, [and] did not authorize" third parties to make them. (MTD at 13.) That is not a jurisdictional argument. It is the denial of vicarious liability, which Pure Energy repeats, in nearly the same words, as its lead Rule 12(b)(6) argument. (MTD at 18-28.)

#### A. The FAC plausibly alleges an injury traceable to Pure Energy.

A plaintiff has Article III standing when he suffers an injury in fact that is fairly traceable to the defendant and redressable by the Court. *Hossfeld*, 544 F. Supp. 3d at 1331. "[R]eceipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing." *Id.* (cleaned up). The TCPA "establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive." *Dolemba*, 213 F. Supp. 3d at 993-94 (cleaned up). Plaintiff alleges that he received at least three calls on a residential number listed on the Registry, from a number used by an operation that marketed Pure Energy's services under Pure Energy's terms and enrolled him with Pure Energy. (FAC ¶¶ 20-39.)

Traceability asks only whether "the defendant is responsible for the injury, rather than some other party not before the court." *Mestas v. CHW Grp., Inc.*, 508 F. Supp. 3d 1011, 1032-33 (D.N.M. 2020) (citation omitted). Where, as here, the defendant is alleged to be liable for the calls

as the principal on whose behalf they were made, the injury is traceable to it. A principal that is liable for its agent's calls is "responsible for the injury," and the agent's absence from the case does not change that. *See Hartley-Culp*, 52 F. Supp. 3d at 703 (TCPA liability extends to "any person or entity *on whose behalf* a third party places a call"). Redressability follows for the same reason. A judgment against Pure Energy remedies the injury Pure Energy is alleged to have caused.

**B. Traceability here rises or falls with vicarious liability.**

In *Mestas*, the defendants argued that the plaintiff's injury was not traceable to them. The court observed that the argument "hinges on Defendants' previous, and already rejected, contention that Plaintiff did not sufficiently allege facts connecting [the defendants] to the subject telephone calls," and held that "for the same reasons that Defendants' arguments regarding vicarious liability fail, so too do their arguments regarding standing." 508 F. Supp. 3d at 1033. So too here. Pure Energy's traceability argument depends entirely on its contention that the callers were independent contractors for whose calls it bears no responsibility. Whether Energy Source Services was acting as Pure Energy's actual or apparent agent, or whether Pure Energy ratified its conduct, are jury questions on the merits on which liability turns. A defendant's denial that it is responsible for the calls is not an "obstacle to Article III standing"; it is a merits defense. *Cf. Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1099 (D. Ariz. 2024) ("a TCPA defendant's contention that the plaintiff consented to the receipt of the challenged communication is a merits-based defense, not an obstacle to Article III standing") (cleaned up).

The Court has already recognized as much. When Pure Energy first moved, the Court ordered counsel to confer about "the identity of the entity that allegedly made the telephone calls," and warned that a second round of affidavits would require it to "treat this as a summary judgment proceeding under Fed. R. Civ. P. 12(d), which would involve a great deal of expense for both

Parties." (ECF No. 16 at 1.) The Court then dismissed without prejudice and granted discovery on "the identity of the caller and the source of the alleged calls." (ECF No. 24 at 1; *see* MTD at 1.) Pure Energy responds by submitting another affidavit and labeling the argument "factual" so that the Court may weigh the evidence without converting the motion. (MTD at 1 n.1, 9-10.) But the label does not change the nature of the dispute. The facts Pure Energy asks the Court to find against Plaintiff, that Pure Energy did not authorize, direct, or know of the calls and that the callers were independent contractors, are facts about Pure Energy's relationship with the callers, which are the same facts on which Plaintiff's vicarious liability claim depends, and the same facts which are now clearly solely within Pure Energy's knowledge as a party before this Court. Those facts are bound up with the merits and are for the trier of fact. *See Cocciolillo v. SmartMatch Ins. Agency, LLC*, 821 F. Supp. 3d 998, 1002 (W.D. Mo. 2026) ("Normally the existence or nonexistence of a principal-agent relationship is a fact question left to the trier of fact.") (cleaned up); *Hudson v. HomeAdvisor, Inc.*, 348 F.R.D. 690, 692 (D. Colo. 2025) (rejecting a motion to dismiss that "is fundamentally a fact dispute that is inappropriate for resolution at this stage of litigation").

### C. The Routhier Declaration does not break the link between Pure Energy and the calls.

Even if the Court were to weigh the Routhier Declaration, it would not carry the weight Pure Energy places on it, for four reasons.

*First*, the declaration is conclusory on the dispositive questions. It states that Pure Energy "does not direct, control, or have any knowledge of or involvement in the calling activities of these independent contractors," and that "[a]t no time are unsolicited outbound telemarketing calls made by Pure Energy or with the authorization or knowledge of Pure Energy." (Routhier Decl. ¶¶ 11, 13.) At the same time, it does not identify these "independent contractors" or even the nature of Pure Energy's relationship to them, let alone address why Mr. Amar appears to have disregarded

this litigation entirely. The declaration is rife with legal conclusions about control and authorization, offered without a single contract, communication, or record. Routhier never identifies the "independent contractors" with whom Pure Energy works, does not confirm or deny their identity as the (former) co-defendants, never attaches the contracts she says prohibit outbound calls, and never describes any audit or monitoring of what the contractors actually do.

*Second*, and critically, the declaration does not address the facts on which the FAC rests. The FAC alleges, from VerbatimTPV's production, that Pure Energy's *own Verbatim TPV account that it is required to maintain under Pennsylvania law* contains a login associated with "alan@psg.zone" and the alias "PurePSGPA," and that the "CSD 02" code on Plaintiff's verification record is tied to that login. (FAC ¶¶ 51, 66.) Routhier says nothing about that login, who created it, who used it, or why a user purportedly outside Pure Energy or its control had access to Pure Energy's account to process sign-ups at all. She says that Pure Energy does not "do business with" entities called "PurePSGPA" or "PSG Zone," and that it does not know who Amar, Akhavan, or "Alan" are. (Routhier Decl. ¶ 15.) But she does not say who held that login or why it exists and she does not deny that the person who did was working for one of the "independent contractors" whose identities are undisclosed. A denial that Pure Energy hired a particular name is not a denial that the persons behind it were acting through one of Pure Energy's contractors, which is precisely what the FAC alleges as to Amar's "agents and vendors." (FAC ¶ 46.)

*Third*, the declaration confirms several of the facts that support agency. Routhier states that Pure Energy's products are sold through "third parties" who take calls, that "the sale is completed during the initial inbound call to the contractor," and that "Pure Energy is notified electronically that the sale was completed." (Routhier Decl. ¶¶ 7, 10.) She states that the contractors' outbound calls "are to be limited to necessary and ordinary business calls after the consumer initiated call,"

including calls when "an inbound call is inadvertently disconnected." (*Id.* ¶ 10.) That is Pure Energy describing the terms on which its contractors may place calls, which is evidence of the right to control "the manner and means" of the campaign. *Cocciolillo*, 821 F. Supp. 3d at 1002-03 ("If a seller has the ability to oversee the conduct of telemarketers . . . it may be enough for liability.") (cleaned up). Pure Energy's own account thus contemplates that its contractors place outbound calls in the course of the sales process, which is difficult to square with the "strictly inbound" premise of its motion. (MTD at 13.) A contractual prohibition on outbound telemarketing, of which no evidence has been provided, shows what the contract (allegedly) said, not what Pure Energy knew, permitted, or accepted in practice. That is a question of fact.

*Fourth*, the premise that Plaintiff has not rebutted the declaration is false. The case on which Pure Energy principally relies, *Baccari v. Carguard Admin., Inc.*, 2022 WL 3213839 (E.D. Pa. Aug. 8, 2022), is described by Pure Energy as one in which the plaintiff's allegations were "purely conclusory" and the defendant's evidence "unrebutted." (MTD at 12-13.) Here, by contrast, the FAC rests on carrier records, a Google subpoena return, VerbatimTPV's login tables, and a recorded statement by "Alan" that he was calling "on behalf of Pure Energy." (FAC ¶¶ 45-51, 67.) Pure Energy calls that statement "not credible" (MTD at 6), but credibility cannot be resolved on the pleadings. *See Swierkiewicz*, 534 U.S. at 511. As the court in *Abboud* held in rejecting a similar attempt, the court "must accept Plaintiff's contrary allegations as true at this stage of the case," even where the defendant's declaration says otherwise. 731 F. Supp. 3d at 1105. And, when evidence conflicts on a question of agency, the answer is discovery, not dismissal. *Hudson*, 348 F.R.D. at 692 (arguments that "fly in the face of Plaintiff's allegations, which I must presume are true for the time being," do not support dismissal) (cleaned up).

Plaintiff recognizes that some courts have dismissed claims on a defendant's uncontroverted affidavit in cases that had not been the subject of any discovery. *See Mestas*, 508 F. Supp. 3d at 1020 (distinguishing personal jurisdiction decisions in which defendants "controverted" the plaintiffs' allegations "by affidavit"). Those decisions do not apply where, as here, the plaintiff has pleaded specific facts drawn from third-party discovery, the defendant's affidavit leaves those facts unanswered, and the very evidence needed to resolve the conflict is in the defendant's hands. The proper course is the one the Court set in October 2025: either deny the motion on the pleadings or, if the Court considers the Routhier Declaration, treat the motion as one for summary judgment under Rule 12(d), and allow Plaintiff the opportunity to take discovery from Pure Energy itself, including the contracts, communications, and VerbatimTPV records that Routhier's declaration describes but does not produce. (ECF No. 16 at 1.) Pure Energy chose to rest its motion on a declaration, and it must accept the procedural consequences the Court has already identified.

## II. The FAC plausibly pleads Pure Energy's liability.

Pure Energy argues that the FAC fails to plead either direct or vicarious liability. (MTD at 15-28.) Plaintiff's claim against Pure Energy is one for vicarious liability, and the FAC pleads it with specific facts that go well beyond labels.

### A. The FAC plausibly alleges that Pure Energy is vicariously liable for the calls.

#### 1. The pleading standard is generalized facts, and agency is a question of fact.

Vicarious liability under the TCPA may rest on actual authority, apparent authority, or ratification. *Van Baalen*, 729 F. Supp. 3d at 1246. As set out above, the plaintiff need allege only "a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Klassen*, 702 F. Supp. 3d at 1058-59 (cleaned up). A

plaintiff "must allege some facts regarding the relationship between an alleged principal and agent" and "cannot simply allege general control in a vacuum," *Mestas*, 508 F. Supp. 3d at 1023-24 (cleaned up), which is the standard Pure Energy invokes. (MTD at 21.) But Pure Energy goes further. It argues in a generic fashion that Plaintiff must plead "the specific steps of how and when the calls were made, the content and recipients, the equipment used." (MTD at 20.) That is a demand for evidence, not generalized facts, and courts applying the TCPA have declined to impose it. As one court put it, "a 'minimal level of control' by a principal can establish an agency relationship." *Van Baalen*, 729 F. Supp. 3d at 1248 (citation omitted). And the control that matters is "whether the principal controlled or had the right to control the agent and, more specifically, the manner and means of the [call] campaign." *Cocciolillo*, 821 F. Supp. 3d at 1002 (cleaned up).

The standard is generalized rather than evidentiary for a practical reason. Plaintiffs cannot know the inner workings of a seller's relationships with its marketers. In *Dolemba*, the court explained that the defendant "does not suggest how [the plaintiff] could reasonably be expected to know those facts at this stage in the litigation," and that "it is likely that all of the documents and information that establish (or refute) the details of the agency relationship . . . are exclusively within the Defendants' custody and control." 213 F. Supp. 3d at 997 (cleaned up). The plaintiff therefore "is not required to plead specific evidence to which he is not privy." *Id.* In *Klassen*, the court relied on "the information asymmetry inherent in this type of action" to hold agency adequately pleaded, because "until discovery is complete, it would be almost impossible for [the plaintiff] to know this information." 702 F. Supp. 3d at 1059. Even where the facts "may not be sufficient to prove any theory of vicarious liability," they are "more than sufficient . . . to entitle [the plaintiff] to further discovery." *Dolemba*, 213 F. Supp. 3d at 997.

### 2. The FAC pleads facts showing actual authority.

The FAC does not allege "general control in a vacuum." It alleges specific facts about the relationship between Pure Energy and the Energy Source Services operation showing that Energy Source Services had the actual authority to market Pure Energy's services by telephone.

*The login.* Pure Energy "authorized the Energy Source Services Defendants to sell electric services on its behalf and directly gave them login information to Pure Energy's account with VerbatimTPV." (FAC ¶ 51, 64.) VerbatimTPV's records show a user and login in *Pure Energy's account* associated with "alan@psg.zone" and "PurePSGPA," and VerbatimTPV told Plaintiff that Pure Energy alone controls who has access to its account. (FAC ¶¶ 51, 53.) This is the kind of allegation courts have found probative. In *Mestas*, the plaintiff alleged that the defendants allowed the telemarketers to "enter consumer information into [the defendant's] sales, dialing or operational systems," and the court held that, read together with the other allegations, the plaintiff had "plausibly state[d] that [the callers] were acting as agents." 508 F. Supp. 3d at 1023-24 (cleaned up). In *Dobronski*, the court found vicarious liability plausibly alleged where insurers gave the call centers access to their computer systems for pricing, the ability to enter data into those systems, and authority to use their names to market products. 769 F. Supp. 3d at 700-02.

*The sales process.* Pure Energy "supplied . . . and controlled" the state-mandated verification function "through which every sale, including Plaintiff's, had to pass," and, because the sale could not be completed without Pure Energy's verification and acceptance, it controlled "the sequence and compliance framework of the enrollment for each customer." (FAC ¶ 65.) It "specif[ied] the leads and enrollment criteria it would accept," thereby directing "the content, method, and criteria of the communications." (FAC ¶ 71.) The "CSD 02" designation on Plaintiff's completed verification record ties his sale to the persons authorized to submit enrollments into Pure Energy's system. (FAC ¶ 66.)

*The content of the pitch.* The callers "marketed Pure Energy by name and conveyed Pure Energy's specific pricing and benefit terms, including special offers," which is possible only if they "possessed, and were authorized to convey, Pure Energy's proprietary offer terms." (FAC ¶ 63.) "Travis" told Plaintiff he would receive up to $200 "from Pure Energy USA every six months." (FAC ¶ 36.) A seller that supplies the offer terms its marketers deliver controls what is said on the call. Courts have treated approval of scripts and call content as a hallmark of control. *See Cocciolillo*, 821 F. Supp. 3d at 1002-03; *Van Baalen*, 729 F. Supp. 3d at 1247.

*The admission.* After suit was filed, "Alan," whose Google Voice number is registered to Akhavan, called Plaintiff's counsel and said he was calling "on behalf of Pure Energy," and that "we" (presumably, Akhavan and Amar and their company) had called Plaintiff multiple times in connection with the sale of energy services. (FAC ¶¶ 47-48, 67.) Taken as true, that is a statement by a participant in the calling operation that it acted for Pure Energy.

*The ability to oversee.* Pure Energy "had the means" to investigate how its marketers generated enrollments "by auditing the TPV records and recordings themselves." (FAC ¶ 72.) "If a seller has the ability to oversee the conduct of telemarketers . . . it may be enough for liability." *Cocciolillo*, 821 F. Supp. 3d at 1002-03 (cleaned up).

These allegations are far removed from the pleading in *Childress v. Liberty Mut. Ins. Co.*, No. 17-cv-1051, 2018 WL 4684209 (D.N.M. Sept. 28, 2018), on which Pure Energy relies, where the only alleged link between caller and defendant was a call transferred to the defendant's in-house telemarketer. (MTD at 23-24.) As the court in *Mestas* explained in distinguishing that very decision, the plaintiff there "does not rest his theory of control solely on the conclusion that a principal/agency relationship existed, or on a single transfer of a call from a third-party telemarketer to the seller's in-house telemarketer." 508 F. Supp. 3d at 1025 (cleaned up). Neither

does Plaintiff, who here relies on the above-mentioned evidence, including third-party evidence, that Pure Energy authorized the caller's submission of information to state-mandated systems and processes for the purpose of selling Pure Energy's services. Pure Energy's remaining argument, that a seller cannot be liable "merely because they stand to benefit from the call" (MTD at 24), addresses an allegation Plaintiff does not make. The FAC alleges benefit together with credentials, control of the sales channel, the offer terms, and an admission of agency, not just mere benefit.

### 3. The FAC also pleads apparent authority and ratification.

Two alternative bases for liability are apparent authority, which exists where the principal's own conduct would lead a reasonable person to believe the callers speak for it, and ratification, which exists where the principal knowingly accepts the benefits of the conduct. *Dobronski*, 769 F. Supp. 3d at 698-99. Courts have found both adequately pleaded on facts like these. In *Dobronski*, an insurer provided the call center access to its systems and authorization to use its name, and then sent the plaintiff an application by email during the call and a letter on its letterhead the next day. The court held that "[a]t this stage of the case, these allegations are sufficient for a showing of apparent authority or ratification." *Id.* at 700-01. The court reached the same result as to a second insurer, rejecting its argument that there was no ratification because it never issued a policy or received payment. *Id.* at 702. In *Hossfeld*, the court held ratification adequately alleged where the defendants ratified the calls "by emailing contracts and quotes for insurance to Plaintiff" and "handling billing and other administrative services," and concluded that those allegations "are sufficient to plead a cause of action based on vicarious liability." 544 F. Supp. 3d at 1332 (cleaned up). And whether an agency relationship existed is "for a trier of fact to decide." *Id.*

The FAC alleges the same conduct and more. The transaction proceeded "as a single, continuous enterprise," from the calls, through the verification process that Pure Energy supplied,

to "Pure Energy's acceptance of the enrollment and issuance of the customer contract." (FAC ¶ 62.) Nothing told Plaintiff he was dealing with independent entities. Rather, the callers held themselves out as enrolling him for Pure Energy's services, and the process ended in a Pure Energy contract and confirmation. (FAC ¶¶ 44, 68.) Pure Energy "accepted the fruits of the illegal calls by completing Plaintiff's enrollment, sending the customer contract and confirmation, maintaining the TPV process," and failing to repudiate the sale or the operation after learning how the lead was generated. (FAC ¶ 69.) It had both the knowledge and the means to find out how the enrollments were generated, and chose not to. (FAC ¶¶ 70, 72-74.) The FCC has said that evidence of such circumstances "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." (FAC ¶ 75 (quoting *In re DISH Network*, 28 FCC Rcd. at 6593 ¶ 46).)

Pure Energy's reliance argument, that Plaintiff must show he "has changed his position" because of something Pure Energy said or did (MTD at 25-26), misconceives apparent authority in the TCPA context. The question is whether the seller's conduct would lead a *reasonable person to believe* that the callers were authorized to act for it, *see Dobronski*, 769 F. Supp. 3d at 698-99, 701, and here the callers delivered Pure Energy's offer, put Plaintiff through Pure Energy's verification process, and generated a Pure Energy contract which was mailed to him directly from Pure Energy. The argument that Plaintiff "lied" and "feigned interest" (MTD at 14, 26) is not in the FAC. It is Pure Energy's characterization of Plaintiff's motives, which cannot be considered on a motion to dismiss. According to the FAC, Plaintiff returned the missed calls "to see who had called him three times." (FAC ¶ 30.) And Pure Energy's ratification argument, that ratification requires prior actual authority and knowledge (MTD at 26-28), fails on the facts alleged. The FAC alleges that Pure Energy gave the callers access to its system, accepted the enrollment with

knowledge of the channel through which it arrived, and had the means to audit that channel. (FAC ¶¶ 64-65, 69-74.) Whether Pure Energy actually knew, or "should have known of the actual facts" (MTD at 27 (citation omitted)), is a question of fact that cannot be resolved against Plaintiff here.

Finally, Pure Energy's contention that Plaintiff's rescission of the contract negates any benefit has no purchase at this stage. The FAC alleges that Pure Energy accepted the enrollment and issued a contract (FAC ¶¶ 38, 60, 69), and ratification does not turn on whether the sale ultimately stuck, let alone whether it was repudiated *by the other counterparty who was not the ratifier*. *See Dobronski*, 769 F. Supp. 3d at 702 (rejecting argument that ratification did not occur because no policy was issued and no payment received).

**4. The FAC does not contradict the original Complaint, and alternative pleading is permitted.**

Pure Energy characterizes the FAC as a "sham pleading" reflecting a "180º reversal" of Plaintiff's theory. (MTD at 3, 17.) There was no reversal. The original Complaint alleged that Plaintiff received telemarketing calls from a toll-free number, that he called back and spoke with "Tessa" and "Travis" of "Energy Source Services," and that the calls were made by "Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf." (ECF No. 1 ¶¶ 24-33, 53.) In opposing the first motion, Plaintiff argued that the calls came "directly from Pure Energy" but "initially under the fake name 'Energy Source Services.'" (ECF No. 12 at 6-7.) Plaintiff did not know, and could not know, who stood behind that name at the time. Pure Energy's declaration said only that it uses contractors who take inbound calls. The Court told the parties to find out who made the calls. (ECF No. 16 at 1.) Plaintiff then did what the Court allowed, learned who held the toll-free number and the "Alan" number, and learned that a login in Pure Energy's own account was tied to the operation. (FAC ¶¶ 42-53.) The FAC pleads those new facts and the corresponding theory. Adding facts learned in court-authorized discovery is not a sham.

Nor does the FAC's reference in ¶ 70 to Pure Energy being "directly and/or vicariously liable" (MTD at 17) defeat it. The Federal Rules permit a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically," and "the pleading is sufficient if any one of them is sufficient." FED. R. CIV. P. 8(d)(2). A party "may state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3). Plaintiff's principal theory against Pure Energy is vicarious liability. But Plaintiff may not know until discovery how much of the Energy Source Services operation was, in fact, Pure Energy, and he is entitled to preserve the alternative that Pure Energy personally participated through the logins in its own account. The same is true of the FAC's statement that "Amar and/or his agents and vendors, including possibly Akhavan and PSG Zone," used the toll-free number. (FAC ¶ 46.) Pure Energy says this means the caller could be "any number of unidentified third parties." (MTD at 22.) But the FAC names the operation that placed the calls ("Energy Source Services"), the person who holds the number, the person whose phone placed the "Alan" call, and the user in Pure Energy's account who submitted the enrollment. Pleading that persons in a chain of vendors may have participated is not a defect. It is the reality of outsourced telemarketing, which the FCC has described as the reason sellers may not avoid liability by "outsourcing [their] telemarketing activities to unsupervised third parties." (FAC ¶ 57 (quoting *In re DISH Network*, 28 FCC Rcd. at 6588 ¶ 37).) The question under Rule 8 is whether a plaintiff has plausibly alleged that the seller is responsible for the calls. This FAC does. *See Cocciolillo*, 821 F. Supp. 3d at 1002.

**5. Pure Energy cannot rely on the absence of third parties it alone can identify.**

The core of Pure Energy's motion is that the FAC "does not even plausibly allege who plaintiff contends actually made the subject calls." (MTD at 21.) But the FAC alleges who made the calls, the operation using the (833) 423-0533 number under the name Energy Source Services,

which the subscriber records tie to Amar, and whose representatives' enrollments were submitted through a login in Pure Energy's account that carries the alias "PurePSGPA." What the FAC does not yet allege is the legal identity of the person behind "PSG Zone," and it explains why. VerbatimTPV told Plaintiff that Pure Energy, not VerbatimTPV, controls who has access to the account, set any aliases, and holds that information. (FAC ¶¶ 8, 52-53.) That is the situation *Dolemba* describes: facts "exclusively within the Defendants' custody and control" that the plaintiff "is not required to plead." 213 F. Supp. 3d at 997. Pure Energy knows the answer. Its declarant says that it works with "independent contractors" under contract and that it is "notified electronically" when a sale is completed. (Routhier Decl. ¶¶ 9-11.) It doesn't disclose them.

Pure Energy's motion also treats the changes in the party list as if they were concessions. The Clerk entered default against Akhavan after he was served. (ECF Nos. 28, 30.) Plaintiff dismissed the other two newly named defendants without prejudice under Rule 41(a)(1)(A)(i), and asked the Court to move the case forward against the only party that has appeared. (ECF No. 31.) Those were case management choices. They did not change the facts alleged, and they leave Plaintiff free to join the dismissed parties once Pure Energy's records identify them with sufficient information necessary to be able to effectuate service. (*See* FAC ¶ 8.) Pure Energy points to what it calls "nearly eight months" of discovery. (MTD at 1, 15.) That interval is what the Court-authorized discovery required, which necessitated serial third-party subpoenas through a chain of carriers, Google, and VerbatimTPV because Pure Energy refused to identify any third parties as the Court ordered. (ECF No. 24 at 1-2.) None of it was discovery from Pure Energy. And the later passage of time before this motion was in part of Pure Energy's own making, since it asked that its response be deferred until the new defendants had been served. (ECF No. 27.) And Pure Energy now asks that Plaintiff "not be afforded any more discovery." (MTD at 28 n.9.) In other words,

Pure Energy would have the Court hold against Plaintiff the one gap in his knowledge that Pure Energy alone can fill, and then decline to let him fill it. The Rules do not require that result. A complaint need only contain enough facts "to raise a reasonable expectation that discovery will reveal evidence of" each necessary element, *Hartley-Culp*, 52 F. Supp. 3d at 701-02 (cleaned up), and, where agency is the issue, "[t]he contours of the liability asserted by plaintiff . . . are as of yet unclear, and require factual discovery to flesh out." *Id.* at 705. "It may be that those facts will not bear out the plaintiff's claims." *Id.* But that is a question for summary judgment on a full record.

**B. Pure Energy's argument about direct liability is beside the point.**

Pure Energy devotes several pages to the proposition that the FAC does not plead that Pure Energy "physically placed" the calls. (MTD at 16-18.) Plaintiff does not contend otherwise. The FAC pleads that the Energy Source Services Defendants are directly liable as the initiators of (i.e. the entity that physically placed) the calls and that Pure Energy is vicariously liable for them. (FAC ¶¶ 54, 59, 76.) Vicarious liability is a sufficient basis for a claim under § 227(c)(5), which reaches calls made "by or on behalf of the same entity." 47 U.S.C. § 227(c)(5); *see Hartley-Culp*, 52 F. Supp. 3d at 703. The FAC's reference in ¶ 70 to "direct" liability, pleaded in the alternative, does not detract from its vicarious liability allegations. FED. R. CIV. P. 8(d)(2)-(3). And Pure Energy's authorities holding that calls made "on behalf of" a defendant do not support direct liability (MTD at 17) are irrelevant. Plaintiff's theory against Pure Energy is not that it dialed the calls, but that they were made *on its behalf*, which is sufficient for liability under a plain reading of the statute. 47 U.S.C. § 227(c)(5); *Katz v. Allied First Bank, SB*, No. 22 C 5277, 2026 WL 636723, at *7 (N.D. Ill. Mar. 6, 2026) (noting that the plain text of the statute imposes "on behalf of" liability).

**III. Pure Energy's remaining challenges to Count I fail.**

**A. The FAC plausibly alleges telephone solicitations.**

Pure Energy argues that because Plaintiff did not answer the three outbound calls, he cannot plead their content, and that the callbacks he placed cannot supply it. (MTD at 28-31.) The argument misreads the statute. A "telephone solicitation" is "the initiation of a telephone call or message *for the purpose of* encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15) (emphasis added). The statutory focus is on the *purpose of the initiation*, not on whether the recipient picked up. "The purpose of a text or call determines whether it qualifies as a telephone solicitation, and courts use 'a measure of common sense' to determine its purpose." *Abboud*, 731 F. Supp. 3d at 1102 (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)). "[N]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Coffey v. Fast Easy Offer, LLC*, 178 F.4th 480, 483 (9th Cir. 2026) (quoting *Chesbro*, 705 F.3d at 918). A court "must consider not only the content of the messages [the plaintiff] received, but also their context as it illuminates Defendants' purpose in initiating the messages," and an allegation that "one purpose" was to encourage a purchase is "enough to satisfy the statutory definition." *Id.* at 483-84. A caller also need not directly offer anything for sale; it "may merely encourage the future purchase of property or services," and the definition reaches calls that refer a consumer to encourage a purchase. *Abboud*, 731 F. Supp. 3d at 1102 (cleaned up).

Here, the context shows that purpose. Within two days, a single toll-free number called Plaintiff, a person with no relationship to Pure Energy, at least three times. (FAC ¶¶ 26-29.) When Plaintiff called the number back, the first representative explained that her company "was calling and looking to assist all Pennsylvania electric customers to ensure they were getting their benefits applied onto the correct account by getting a competitive electric supplier." (FAC ¶ 31.) The

second representative identified Plaintiff as "Philip Fleming" from Philadelphia, which the FAC alleges was "the incorrect information they had for the individual they were looking for on the previous calls." (FAC ¶ 34.) In other words, the persons at the other end of the callback identified themselves as the source of the earlier calls, and admitted those calls were made to sign up Pennsylvania electric customers with an electric supplier. The representative then offered a reimbursement of up to $200 "from Pure Energy USA every six months," and moved Plaintiff into a verification process that ended in a Pure Energy contract. (FAC ¶¶ 36-39.) Drawing every reasonable inference in Plaintiff's favor, the purpose of the earlier calls, made from the same number by the same operation, was the same as the purpose of the conversation they led to, to enroll electric customers with Pure Energy. That is "common sense," and it is all that is required. *Abboud*, 731 F. Supp. 3d at 1102-03 (finding it "difficult to imagine" why the defendant would repeatedly encourage the plaintiff to sign up for offers "other than to encourage her to make future purchases"); *Hudson*, 348 F.R.D. at 693 (assuming the plaintiff's allegations true, "the only reasonable conclusion" was that unprompted messages were telephone solicitations).

Pure Energy's answers to this are unavailing. *First*, its observation that Plaintiff's own callbacks "do not violate the TCPA" (MTD at 14 n.5) is true and irrelevant. Count I rests on the three outbound calls. The callbacks are evidence of what those calls were for and for whom they were placed. *Second*, Pure Energy asserts that Plaintiff "lied and falsely expressed interest" in a rebate, and that its name was not mentioned until he did. (MTD at 14, 29-30.) None of that is in the FAC, which alleges that Plaintiff called back "to see who had called him three times," gave information, and was told of a Pure Energy reimbursement. (FAC ¶¶ 30, 35-36.) In any event, what Plaintiff said on a callback could not change the caller's evident purpose for which the earlier calls were initiated, to sell electric service, and Pure Energy's account of Plaintiff's motives in

identifying the caller is not a basis for dismissal. *See Hudson*, 348 F.R.D. at 692 (arguments that "fly in the face of Plaintiff's allegations, which I must presume are true," are not a basis for dismissal) (cleaned up). Indeed, this Court has held as much with respect to Mr. Shelton's nearly identical conduct in attempting to identify another alternative electricity supplier that called him illegally: "The fact that [Mr. Shelton] "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation." *Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *5 (E.D. Pa. Apr. 5, 2019) (same Plaintiff).

*Third*, Pure Energy's declarant states that any outbound calls by contractors are "not for advertising or marketing purposes." (Routhier Decl. ¶ 10.) That is a factual assertion on the very question of purpose, and "the ultimate question" whether a communication is a pretext for selling goods or services "is a question of fact not suitable for disposition as a matter of law upon a motion to dismiss." *Abboud*, 731 F. Supp. 3d at 1104 (cleaned up). *See also Less v. Quest Diagnostics Inc.*, 515 F. Supp. 3d 715, 717-18 (N.D. Ohio 2021) (denying motion to dismiss Do Not Call claims because "[m]ore information is needed" to determine whether calls were solicitations, including the caller's business strategy and how the calls generated revenue). *Fourth*, the decisions Pure Energy cites involved, by its own description, complaints that said nothing about what the unanswered calls were for, or that did not allege that the caller encouraged any purchase. (MTD at 29-31.) The FAC pleads the content and context, and it pleads that the operation behind the calls enrolled Plaintiff with Pure Energy.

**B. The FAC adequately alleges that Plaintiff's number was on the Registry.**

Pure Energy's last challenge to Count I is that the regulation prohibits solicitation of a "residential telephone subscriber who has registered his or her telephone number," and that Plaintiff therefore had to plead that *he* registered the number himself. (MTD at 31-33.) The FAC alleges that the number "has been listed on the National Do Not Call Registry for over a year prior to the calls at issue," that it is a residential line used for personal and household purposes, and that Plaintiff never consented to the calls. (FAC ¶¶ 19-25, 79.) Pure Energy concedes that "there are cases to the contrary" on its reading. (MTD at 32.) There are, and they are the ones better reasoned.

There is no "personal" registration requirement for the Do Not Call Registry, because the Registry does not even collect names. Start with what the Do Not Call Registry protects: telephone numbers, not specific persons. 16 C.F.R. § 310.4(b)(1)(iii)(B) ("That person's telephone number is on the 'do-not-call' registry . . . ."). The regulation states the only requirement for proving a violation: that the "telephone number" be "on" the NDNCR. It says nothing about who placed it there, or even that the subscriber must have placed it there at all. Congress ratified the language the FTC promulgated, protecting "telephone numbers" that are "on the [NDNCR]," full stop, and without reference to who registered the number. 15 U.S.C. § 6151(b).

The FCC's parallel TCPA regulation permits a "residential telephone subscriber" to register "his or her telephone number" on the Registry, and provides that once registered, "registrations must be *honored indefinitely*," until cancelled by the consumer or removed by the database administrator. 47 C.F.R. § 64.1200(c)(2). "There is no limitation as to time period; nor is there a limitation as to whether the phone number is still used by the person who originally listed it in the NDNC Registry." *Nichols v. eHealthInsurance Servs., Inc.*, No. 23-CV-06720-EKL, 2025 WL 689721, at *3 (N.D. Cal. Mar. 3, 2025). Reading the regulations to impose an implied personal registration requirement cannot be reconciled with the requirement that

registrations "must be honored indefinitely," or with the reality that the Registry stores only numbers, not names.

A personal registration requirement would also be unworkable and atextual. As another court has recognized, the regulation's "indefinite[]" language exists precisely "to remove the ambiguity of which numbers should be protected." *Abrahamian v. loanDepot.com LLC*, No. CV-23-00728-PHX-SMB, 2024 WL 1092442, at *2 (D. Ariz. Mar. 13, 2024) (observing that the Ninth Circuit, just as the Third Circuit, has taken "a broad view of this regulatory language."). In any event, who registered the Number is, at most, a disputed fact, and an immaterial one. It is undisputed that the Number was on the Registry.

In *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019), the Fourth Circuit held that "[t]he private right of action allows suit by any 'person' who 'received' calls that were placed 'in violation of' the TCPA regulations," *id.* at 656, and that the right is not limited to telephone subscribers. *Id.* at 656-57. "[W]e see no reason that the private right of action should be limited only to those who can list their numbers on the registry," the court explained, because "[s]uit can only be brought by those who receive multiple violative calls," and "[c]alls are only violative if the phone number was on the Do-Not-Call registry." *Id.* at 657. The same reasoning applies to who did the registering. "There is no statutory requirement that the phone number's user—as opposed to the subscriber—register the number." *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 390 (D. Mass. 2024). The statute "prohibits calls to all phone numbers listed on the NDNCR, irrespective of who listed the number there," *id.* at 394 (citing *Krakauer*, 925 F.3d at 657), and the regulation's reference to a "residential telephone subscriber" does not narrow the broader statutory term "person," because an agency's interpretation of a statute "cannot bind a court." *Id.* at 394 n.17 (cleaned up). Pure Energy's hypothetical, that anyone could add every

number in America to the Registry, is a matter of consent, which is a merits defense. *See Abboud*, 731 F. Supp. 3d at 1099. That hypothetical also ignores the fact that registering a telephone number on the Registry requires either calling the Registry from the number to be registered or submitting the information to an email-verified form that limits the submissions to three telephone numbers per email address. In any event, the FAC alleges that Plaintiff did not consent, and that the number is on the Registry. (FAC ¶¶ 19, 25, 79.) Nor is there any dispute that the number is residential. A cell phone number on the Registry is presumed residential, and the FAC alleges that Plaintiff uses it for personal and household purposes. *See Radvansky*, 744 F. Supp. 3d at 1319-21; *Van Baalen*, 729 F. Supp. 3d at 1250-51; FAC ¶¶ 20-24.

## IV. Count II states a claim under § 64.1601(e), which is enforceable through § 227(c)(5).

Pure Energy makes two arguments against Count II. The first, that the FAC does not connect Pure Energy to the calls or to the number from which they came (MTD at 33), is broader than the vicarious liability argument addressed in Part II. The regulation requires "[a]ny person or entity that engages in telemarketing" to transmit caller identification information, including "when available by the telemarketer's carrier, the name of the telemarketer," and it expressly contemplates that a call may instead carry "the name of the seller on behalf of which the telemarketing call is placed." 47 C.F.R. § 64.1601(e), (e)(1). The FAC alleges that each call carried *neither*, rendering no vicarious liability analysis necessary. The CNAM database for each call showed that caller name delivery was available, and each call transmitted the placeholder "TOLL FREE CALL." (FAC ¶¶ 40-41.) Pure Energy faults the FAC for not alleging what appeared on Plaintiff's phone (MTD at 5), but the regulation concerns what the *telemarketer transmits*, which the CNAM results show. And its observation that two different carriers are each described as an "ultimate" carrier (MTD at 6) is simply a matter of the corporate fact that Inteliquent is a carrier

that merged with Onvoy. They are *the same carrier*. Because the FAC alleges that Pure Energy is vicariously liable for the calls, it is liable for the transmission failures of those calls as well.

Pure Energy's second argument is that § 64.1601(e) carries no private right of action, relying on what it calls the "majority approach." (MTD at 33-34.) Pure Energy acknowledges that "certain other courts have ruled differently," including two judges of this Court. *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 575 (E.D. Pa. 2025); *Dovberg v. Haller Enterprises, Inc.*, No. 5:26-CV-4286, 2026 WL 3152723, at *7 (E.D. Pa. Oct. 21, 2026). The decision cited in the FAC, *Dobronski v. SelectQuote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025), held that a private right exists. (MTD at 33 & n.11.) All these courts arrived at the correct conclusion

In *JR Capital*, the court explained that "the existence of a private right of actions [sic] depends on which section of the statute provided the legal authority for issuance of the regulation," and that "if a regulation was created under § 227(c), a private cause of action exists as to that regulation." *Id.* at 575-76. After reviewing the text, the legislative and administrative history, and the presumption that agencies act within their lawful authority, the court concluded that § 64.1601(e) "was promulgated under § 227(c), and that a private right of action exists." *Id.* (cleaned up). It reasoned that the FCC's history shows that caller ID is a network technology the agency adopted to protect residential subscribers' privacy under § 227(c), and that § 64.1601(e) could not lawfully have been promulgated under § 227(d); it "fits best under § 227(c), not (d)." *Id.* at 578-79. And the FCC's silence about a private right of action does not change the analysis, because other regulations the FCC adopted without mentioning one, including the Do Not Call rule at issue in Count I, have been construed to carry one. *Id.* at 579-80 (citing, among others, *Krakauer*, 925 F.3d at 657). The *Dovberg* court endorsed Newell's reasoning in full and almost identically. *Dovberg*, 2026 WL 3152723, at *7-*8.

*SelectQuote* reached the same conclusion. That court concluded that § 227(c) is "the only possible source for § 64.1601(e)," which places the regulation "in the heartland of § 227(c)" and thus within the reach of § 227(c)(5)'s private right of action. 773 F. Supp. 3d at 377 (cleaned up). It also explained that the "majority" cases "add little because they largely rely on *Travel Options* or on each other." *Id.* at 378-380. Pure Energy invokes the principle that courts may not create private rights of action (MTD at 34), but, as *Selectquote* put it, "[t]he question here is not whether courts should imply or 'create' a right of action for § 64.1601(e)," but "whether, as a matter of textual interpretation, § 64.1601(e) falls within the scope of an express cause of action that Congress has already created." *Id.* at 380 (cleaned up). Section 227(c)(5) is that express cause of action: it reaches any call made "in violation of the regulations prescribed under this subsection," and § 64.1601(e) is such a regulation. As the FCC itself explained when it adopted the requirement, "[c]aller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers." *Id.* at 377 (quoting 18 FCC Rcd. 14014, 14068 (2003)). Count II states a claim.

## V. Any dismissal should be without prejudice and with leave to amend.

Pure Energy asks for dismissal with prejudice because Plaintiff "already amended" and had "nearly eight months of pleadings stage discovery." (MTD at 34.) The FAC is the first pleading Plaintiff filed after the Court dismissed the original Complaint without prejudice, granted leave to amend, and authorized discovery on the identity of the caller. (ECF No. 24 at 1.) It is an amendment made in the manner and for the purpose that the Court invited, and the Court has not yet held that it is deficient. The discovery issued thus far has been directed to third parties. Plaintiff has had none from Pure Energy, which holds the contracts, communications, and account records that bear on its relationship with the callers identified through that third party discovery conducted thus far.

And Pure Energy itself requested the extension that deferred its response until the new defendants were served. (ECF No. 27.)

If the Court concludes that any aspect of the FAC is insufficient, it should grant leave to amend. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Plaintiff can, for example, plead additional detail concerning the VerbatimTPV account records, the "CSD 02" designation, the "Alan" call, and the registration of his number, as well as any further facts that come to light in discovery from Pure Energy.

**Conclusion**

For the foregoing reasons, Pure Energy's motion to dismiss the First Amended Complaint should be denied in its entirety. In the alternative, if the Court considers the Routhier Declaration and finds that it controverts the allegations of the FAC, the Court should treat the motion as one for summary judgment under Rule 12(d) and permit Plaintiff to take discovery from Pure Energy before ruling. And if the Court finds any aspect of the FAC deficient, Plaintiff respectfully requests that dismissal be without prejudice and with leave to amend.

RESPECTFULLY SUBMITTED AND DATED this 10th day of November, 2026.

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
PA Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, a copy of the foregoing was served via CM/ECF, which will electronically serve all counsel of record who have appeared.

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
PA Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com